Please Note: We have sua sponte removed this case from the accelerated calendar.
 DECISION.
Appellant James L. Bond was charged with two counts of aggravated burglary, two counts of felonious assault, and two counts of kidnapping, with two firearm specifications attached to each count. The victims of the offenses were Bond's ex-spouse Dawn Bond (now known as Dawn Kennedy) and Arthur Vega. Prior to trial, the state dismissed the aggravated burglary and felonious assault charges involving Vega, the kidnapping charge involving Kennedy, and one of the two firearm specifications attached to the remaining counts.
Bond was tried for the felonious assault of Kennedy, the aggravated burglary of her residence, the kidnapping of Vega and the remaining firearm specifications. Following a bench trial, the trial court dismissed the felonious assault charge pertaining to Kennedy and found Bond guilty of the aggravated burglary of Kennedy's residence and the kidnapping of Vega. The trial court sentenced Bond to three years' incarceration on each firearm specification, to be served concurrently, and to concurrent terms of five years' incarceration on the underlying offenses, with those terms made consecutive to the specifications sentence.
In his appeal, Bond raises two assignments of error. In his first assignment, he argues that the trial court erred by denying his Crim.R. 29(A) motions for acquittal on the aggravated burglary charge and the kidnapping charge. In his second assignment, Bond contends that counsel was ineffective for advising him to waive a trial by jury.
Bond drove to the home of Kennedy ostensibly to return a shotgun owned by her father as a means of preventing himself from committing suicide. It was after drinking several beers that Bond determined that this was a good plan. When he arrived, he noticed Vega's car in the driveway. He assumed that Vega and Kennedy were having an affair, and he "went bananas." He entered the home, holding the shotgun, with the purpose of asking them why they were "doing this to [him]." According to Bond, he saw Kennedy and Vega standing in the kitchen and, after asking them the question, stated that he should "blow [their] heads off and kill [himself], too." He denied intentionally shooting the gun or pointing the gun at anyone.
Kennedy testified that Bond was not allowed to enter her house "without foreknowledge and permission," and that she was not expecting him to visit the night of the incident. She stated that he opened the front door and proceeded up the stairs. When he reached the top of the stairs, Bond leveled the shotgun at Kennedy and Vega, informed them that he had disconnected the telephone, and stated that no one was going to leave alive. (A police officer testified that he examined a telephone box on the left side of the house and noted that it had been tampered with. The evidence, however, demonstrated that the telephone was still functional during the incident.)
Bond made some comments about Vega and Kennedy, and when Vega responded, he told Vega to "shut up and sit down." He did. When Kennedy stepped out of Bond's line of vision, Bond fired a shot into the back wall of the kitchen. He continued to make threats on Kennedy's life, as well as threats of bodily harm. There were times when Bond held the gun to the back of Vega's head while making threatening remarks about him. Kennedy talked to Bond throughout the incident. Bond finally decided to leave. He emptied the shells from the shotgun on the floor. After reaching down to pick up two shells, he left. He told Kennedy and Vega not to call the police.
Vega testified that he was leaving when he saw Bond coming through the front door with the shotgun. When he asked Bond about the gun, Bond pointed it at him and told him to turn around, go back to the kitchen, and sit down. Bond fired the gun and said, "I said sit down." Vega sat. Bond was in the house for approximately thirty minutes, pointing the shotgun and making threats.
Deputy Bill Crock of the Hamilton County Sheriff's Department testified that Bond spoke to him while Crock was completing paper work. Without any questioning by the officer to prompt the remark, Bond stated, "I went over there to make a point, and I made my point."
The charge of aggravated burglary required that the state prove that Bond, by force, stealth, or deception, trespassed in an occupied structure when another was present with the purpose to commit a crime, and that he inflicted, attempted to inflict, or threatened to inflict physical harm on another.[1] The charge of kidnapping required that the state prove that Bond, by force, threat, or deception, restrained the liberty of another to terrorize or to inflict serious physical harm on the victim or another.
Before we may invalidate a trial court's denial of a motion for acquittal, we must conclude that the evidence was such that no reasonable mind could have believed that the state had proved each material element of the crime beyond a reasonable doubt.[2]
In our review, the evidence must be construed in a light most favorable to the state.[3]
We believe that a reasonable trier of fact could have believed that the state had proved Bond guilty. Therefore, we overrule Bond's first assignment.
In his second assignment, Bond contends that he was denied effective assistance of counsel. His specific allegation is that after trial counsel pressured him to waive his constitutional right to a jury trial in exchange for the dismissal of several charges, including two kidnapping charges, the state proceeded to prosecute one of the kidnapping charges. To prevail on his claim of ineffective assistance of counsel, Bond "must demonstrate that his trial counsel substantially violated an essential duty owed to him and that this deficiency prejudiced his defense."[4]
Prejudice is demonstrated where the defendant "was denied some substantive or procedural right that made the `trial unreliable or the proceeding fundamentally unfair.'"[5] It is presumed that a properly licensed attorney is competent, and ineffective assistance cannot be based on debatable tactical decisions by trial counsel.
The record demonstrates that the trial court questioned Bond about his decision to waive a jury and whether he had discussed that decision with counsel. It asked Bond's counsel if Bond was knowingly and voluntarily giving up the right. The court then asked Bond if he had signed the jury-waiver form and if he were sure that he wanted to waive a jury trial. At that point, the court requested the state to read the remaining charges. The state included in its recitation the statement "Specifically that will be aggravated burglary, felonious assault, and kidnapping."
At the sentencing hearing, trial counsel stated that before trial the assistant prosecutor had said that she would not proceed on the kidnapping charges and that he informed Bond accordingly. That afternoon, however, the assistant prosecutor told counsel that she would pursue one of the kidnapping charges. He told Bond. Counsel also informed Bond that he was ready for trial. Earlier he had discussed with Bond whether Bond wanted a jury or a bench trial. Bond initially decided that he wanted a jury trial. At the time they came to court, however, counsel presented the waiver form to Bond and asked him what he wanted to do. (Counsel previously stated that he did not make the decision of what type of trial a person would have.) Bond then signed the form. Bond argues that he did not have sufficient time to consider whether to waive his right to a jury trial.
We conclude that the facts in the record fail to demonstrate that Bond's trial counsel substantially violated an essential duty owed to Bond or that there was prejudice to the defense. First, the record fails to demonstrate that a "deal" was made to dismiss charges in exchange for foregoing a jury trial. Second, we have nothing before us that demonstrates coercion on the part of trial counsel. Accordingly, Bond's second assignment is also overruled and the trial court's judgment is affirmed.
Judgment affirmed.
Doan, P.J., and Hildebrandt, J., concur.
Please Note:
This court has recorded its own entry on the date of the release of this decision.
[1] See R.C. 2911.11(A)(1).
[2] See State v. Bridgeman (1978), 55 Ohio St.2d 261,381 N.E.2d 184, syllabus; State v. Brown (Sept. 25, 1996), Hamilton App. No. C-950300, unreported.
[3] State v. Evans (1992), 63 Ohio St.3d 231, 248,586 N.E.2d 1042, 1056.
[4] State v. Juarez (July 17, 1998), Hamilton App. No. C-970368, unreported, citing Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052.
[5] State v. Combs (1994), 100 Ohio App.3d 90, 101,652 N.E.2d 205, 211-212, quoting Lockhart v. Fretwell (1993), 506 U.S. 364,370, 113 S.Ct. 838, 844.