[Cite as *State v. Johnson*, 2013-Ohio-2719.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-120250 |
| | | TRIAL NO. B-1105638-C |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| BRANDON JOHNSON, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  June 28, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*David H. Hoffman*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} Following a four-week jury trial, Brandon Johnson was convicted of three counts of passing bad checks, 15 counts of theft, and one count of aggravated theft based upon his participation in a check-floating scheme. The trial court sentenced Johnson to an aggregate prison term of 172 months. In this appeal, he raises three assignments of error, arguing that comments made by a prosecuting attorney and a secret service agent to a newspaper reporter, which appeared in a newspaper article during the middle of his trial, denied him a fair trial; that his counsel was ineffective for failing to more thoroughly question the jurors during a voir dire about the article and for failing to impeach the jury's verdict; and that the trial court erred in failing to grant a mistrial following publication of the article.

{¶2} Because the trial court immediately voir dired each member of the jury individually, with the participation of counsel, and dismissed the sole juror who had recalled the specific contents of the article, and because the remaining jurors had limited exposure to the article, and assured the trial court that they could remain fair and impartial, Johnson cannot demonstrate that the prosecutor's published comments denied him a fair trial or that the trial court abused its discretion in denying his motion for a mistrial. We further conclude that Johnson's counsel's decision not to conduct a more thorough inquiry during the voir dire of the jury and not to impeach the jury verdict were matters of sound trial strategy. As a result, we affirm the judgment of the trial court.

{¶3} Johnson was charged in a 51-count indictment with multiple charges of passing bad checks, theft, aggravated theft, and theft of a motor vehicle. Nine other defendants were also charged, but were tried separately. Johnson's jury trial began on February 21, 2012. During the weekend of March 2-3, 2012, the Cincinnati Enquirer

2

published an article online and in the newspaper about Johnson's case. Although the article was primarily about a juror in Johnson's trial being removed for texting during the trial, the last several paragraphs of the article stated the following:

[Judge] Martin is presiding over the criminal case against Brandon Johnson, one of the accused ring leaders of a group of 10 people arrested and charged with writing $618,145 in checks on accounts with no money in them.

The money was spent on cars, trucks and supplies and equipment to start a construction company, [Assistant Hamilton County Prosecutor Andy] Berghausen said.

Most already have pleaded guilty but the three main defendants—Johnson, Scott Neumeister and Faithe Bedel—have yet to have their cases resolved.

The trial is expected to take four weeks before a verdict is reached. More charges are expected against the group because the total figure authorities believe they stole is $1.2 million.

Johnson also has similar charges in Indiana's Ripley and Dearborn counties.

{¶4} The trial judge saw the article on Saturday morning. When the trial resumed the following Monday, he questioned the assistant prosecuting attorney, Andy Berghausen, on the record but outside of the jury's presence, about the article, asking him for the source of the information. Berghausen stated that during a break in the trial, after the juror had been dismissed for texting, a reporter for the Cincinnati Enquirer, Kimball Perry, had called him on his cell phone to ask about the matter. Berghausen told the judge that he had spoken briefly with Perry. When Perry had asked

him about the facts in the case, he had handed his phone to Secret Service Agent Ron Axt to answer the reporter's question.

{¶5}    The trial judge questioned Agent Axt.   Agent Axt told the judge that Berghausen had handed him the phone and asked him to give the dollar amount of the case to Perry.   Agent Axt stated that he had given the aggregate amount of money involved in cases involving all ten defendants, which he had taken from his report. Although the newspaper article mentioned that similar charges were pending against Johnson in other counties, Agent Axt told the judge that he did not disclose that information.   Berghausen, likewise, stated that he had no knowledge of those charges and did not supply any information on the subject.   The trial judge heaped harsh criticism and harsh judgment on Berghausen for speaking to a reporter while the case was ongoing, and for allowing the agent to speak to the reporter.   The trial judge was also critical of Agent Axt.

{¶6}    Berghausen admitted that he had exercised poor judgment by speaking with the reporter and directing Agent Axt to speak with him as well.   The trial judge commented:  "I can't believe the two of you.   I just can't believe how stupid this was, beyond comprehension.   Two weeks of trial, and risking a mistrial with this."

{¶7}    The trial judge then asked defense counsel about the article.   When defense counsel stated that the article was prejudicial to his client, the trial judge agreed. He asked Johnson's counsel if he was moving for a mistrial.    When defense counsel answered affirmatively, the judge stated:

> The only thing I know to do right now is to bring the jurors in one by one, however long that takes, and ask them if they've seen it.  And then try and gauge from there what the damage has been, if any, and then make a separate determination, regardless of what they tell me, whether they are

being straight with me or not, and this just gets —first off, I'm not presiding over a 51-count theft case. I believe it's 19. That's all Jess is typing, I believe, is 19 counts. And this is beyond belief to me. So that's what we'll do.

{¶8}   When court was back in session, the trial court addressed the jury on the record as follows:

Ladies and gentlemen, I've given you no admonitions about not reading the newspaper in this case simply because I didn't think there was any way there was going to be any media coverage, but it did happen on Saturday. It's been on the Enquirer website for a while. And so what I'm going to have to do is voir dire each one of you; in other words, I'll have to bring each of you in one at a time and ask you some questions. I just want honest answers. There's no right or wrong answer to it. And then we'll go from there.

As with everything else, you can't discuss it amongst yourselves at all, or anyone else, discuss how Reds Spring training is going. I think they franchise Taggs, the Bengals did, but whoever that was, you can discuss the relative merits of that, but you can't discuss the case, okay? So just go back to the jury room right now and we'll bring you out one at a time.

{¶9}   The judge then conducted an individualized voir dire of each juror, including the alternate, with both the state and defense counsel participating. Only four jurors admitted reading the article. The first remembered only the fact that the article stated the case could take up to four weeks. The second stated that she had read it quickly, and did not remember the facts of the case. She said the only thing that stood out was the fact that a juror had been dismissed. The third juror said there was nothing

5

in the article not mentioned in court already, except for the amount of money mentioned. When the trial court asked the three jurors if they could decide the case based on what they had heard in the courtroom and not on the information in the article, all three jurors stated that they could be fair and impartial and decide the case on the evidence presented.

{¶10} The fourth juror, Juror No. 11, said that she "was a little upset" about seeing the article "because [she] felt that the report had to come from someone directly in the courtroom, and the prosecutor was quoted, so [she] thought it had to come from him, and [she] just wondered why." When the trial court asked her if she could remember specific details from the article, she said that she remembered the article mentioned

> a ring of ten, which [she] knew there were many people involved, but she didn't think of it in that way. Also, [she] realized there would be a lot more to continue to come because they said this is probably going to go four weeks instead of, you know, the anticipated three. And then there was a money amount. Now [she] couldn't remember from opening statements whether there was–that had been information that had actually been given to us or not.

{¶11} The trial court then asked Juror No. 11 if she could "disregard what was in the article and decide this case based on what you hear in here or do you think this has created kind of a problem for you to proceed?" The trial court further stated, "And there's no right or wrong answer. We just need an honest one."

{¶12} Juror No. 11 responded, "No, I think that I can proceed. I can tell you that I was upset that the defendant's picture was there. I thought that was unfair that that was there, but ---." The trial court then asked counsel for the state and Johnson if they

had questions. The assistant prosecuting attorney asked Juror No. 11 if she had discussed the article with the other jurors, or if she had shared her "thoughts or observations based on having read that article?" Juror No. 11 replied, "No, we said nothing."

{¶13} At the conclusion of voir dire, the trial judge, with the agreement of the assistant prosecuting attorney and defense counsel, dismissed Juror No. 11. The judge then continued the case to give defense counsel an opportunity to research the case law in support of his motion for a mistrial. After hearing argument, the trial judge overruled the motion. He stated that he had questioned the jurors and had also given both counsel the opportunity to do so, and that each juror "had indicated that they could still decide the case fairly and impartially." He further stated that under the totality of the circumstances, the 12 seated jurors could be fair. For the remainder of the trial, the trial judge admonished the jurors before their dismissal each day that they were not to watch or read any news reports about the case.

{¶14} In his first assignment of error, Johnson argues that the assistant prosecuting attorney committed prosecutorial misconduct when he provided a statement to Perry, the reporter for the Cincinnati Enquirer, regarding evidence that he did not intend to produce at trial.

{¶15} In order to succeed on his claim, Johnson must not only demonstrate that the prosecutor's questions or remarks were improper, but that they also prejudicially affected his substantial rights. *See State v. Smith* 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). The state argues that the assistant prosecuting attorney's conduct was not improper. But we need not reach this issue because Johnson cannot demonstrate that he was prejudiced by the comments in the article. The comments were made following the second week of a four-week jury trial, after the state had

produced a significant amount of evidence against Johnson. The trial judge, moreover, examined each jury member individually about their exposure to the article and determined that for all but one juror, whom the judge subsequently dismissed from the panel, the article would not affect their ability to decide the case fairly and impartially.

{¶16} Here, the judge's thorough voir dire dispelled any notion that the jurors had read or retained any prejudicial details not presented at trial. Because the trial judge's actions cured any error regarding the comments in the article, we cannot say the alleged misconduct caused prejudice to Johnson's case and denied him a fair trial. We, therefore, overrule his first assignment of error.

{¶17} In his second assignment of error, Johnson argues that he was denied the effective assistance of counsel. To prevail on this claim, Johnson "must show that his counsel's representation fell below an objective standard of reasonableness" and that he was prejudiced by counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is demonstrated by a showing "that there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694. Both prongs must be met to demonstrate ineffective assistance of counsel. *Id.* at 697. Moreover, it is presumed that a properly licensed attorney is competent. *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Further, ineffective assistance cannot be based on debatable tactical decisions. *Id.*

{¶18} Johnson first argues that his counsel provided ineffective assistance by failing to vigorously question the jurors during the individualized voir dire about the newspaper article. But the Ohio Supreme Court, in addressing claims of

ineffectiveness, has held that "voir dire by defense counsel does not have to take a particular from, nor do specific questions have to be asked." *State v. Evans*, 63 Ohio St.3d 231, 247, 586 N.E.2d 1042 (1992); *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29 ¶ 43, 61-67; *see State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 8828, ¶ 64. "Counsel, moreover, is in the best position to determine whether a potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539, 2001-Ohio-112, 747 N.E.2d 762 (2001).

{¶19} Here, the judge's inquiry, supplemented by that of defense counsel and the assistant prosecuting attorney, was sufficient to probe the issue of the juror's fairness and impartiality. Moreover, defense counsel could be said to have engaged in sound trial strategy by not asking the jurors further questions about the article. Inquiring more about the article with those jurors who had indicated that they had not read the article but had only heard peripherally about the article might have fostered infelicitous speculation. And further detailed questioning by defense counsel of those jurors who had read the article could have drawn the juror's attention to the very information defense counsel had deemed prejudicial and was trying to keep from them. Thus, we cannot conclude that counsel's performance was deficient. Moreover, we must presume that the jury reasonably, conscientiously, and impartially considered the judge's questions. Because there is no evidence that further questions would have changed the outcome of the trial, Johnson cannot show that any prejudice resulted. As a result, we find his first argument meritless.

{¶20} Johnson also argues that defense counsel was ineffective for not attempting to impeach the jury's verdict. He argues defense counsel should have asked the jurors the extent to which their misconduct affected the verdict. But we

9

conclude that any attempt to impeach the verdict in this way would have violated Evid.R. 606(B). Evid.R. 606(B) provides, in pertinent part, that

> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. A juror may testify on the question whether extraneous, prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented.

*See State v. Hessler*, 90 Ohio St.3d 108, 123, 732 N.E.2d 1237 (2000).

{¶21} Here, nothing in the court's voir dire or the jurors' responses substantiates Johnson's claim that the jurors "had so clearly been tainted with reports of false information and the threat of a four week trial." Instead, the record demonstrates that the remaining jurors were not unduly influenced by their exposure to the article and that they could be fair and impartial in deciding Johnson's case. Johnson, moreover, does not argue that he was in possession of any evidence outside the jurors' voir dire responses to prove that they were improperly influenced by extraneous information. Without such evidence, it would have been feckless for defense counsel to attempt to impeach the jury's verdict. We, therefore, conclude that defense counsel's decision to refrain from doing so constituted sound trial strategy.

{¶22} Johnson's reliance upon *Farrer v. State*, 2 Ohio St. 54 (1853) is also misplaced. In that case, a jury took a newspaper article, said to contain part of the judge's charge, into the jury room and used it during deliberations. Additionally, "some of the jurors held communications with their friends and acquaintances in the street" by speaking from an open window of the jury room. But we conclude that this factual scenario is so far removed from the circumstances of Johnson's case that it has no application. Based upon our review of the record, we cannot conclude that defense counsel rendered ineffective assistance in his handling of the matter. We, therefore, overrule the second assignment of error.

{¶23} In his third assignment of error, Johnson argues that the trial court erred in denying his motion for a mistrial.

{¶24} A court should declare a mistrial "only when the ends of justice so require and when a fair trial [i]s no longer possible." *State v. Palmer*, 1st Dist. No. C-060754, 2007-Ohio-6870, ¶ 19, *rev'd on other grounds*, *State v. Palmer*, 120 Ohio St.3d 322, 2008-Ohio-6251, 898 N.E.2d 960. The Ohio Supreme Court has held that great deference should be given to a trial court's discretion "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). The Supreme Court "has declined to apply inflexible standards, due to the infinite variety of circumstances in which a mistrial may arise." *Id.* at 19. We review a trial court's decision to deny a motion for a mistrial under an abuse of discretion standard. *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1986).

{¶25} In his motion for a mistrial, Johnson relied heavily on the Ohio Supreme Court's decision in *State v. Craven*, 35 Ohio St.2d 18, 298 N.E.2d 597

(1973). He argued that the article published in the Cincinnati Enquirer was so highly prejudicial that any harm from the article could not be cured by the trial court's subsequent solicitation of assurances from the jurors that they could be fair and impartial.

{¶26} In *Craven*, the defendant was charged with carrying a concealed weapon. During the course of the trial, the prosecutor asked both a defense witness and the defendant whether they had sold heroin. He specifically asked Craven whether the police had found $35,000 worth of heroin in his home, a fact clearly unrelated to the charge of carrying a concealed weapon. Additionally, a newspaper article was published about the case during the time the jurors were deliberating. It included the fact that the defendant had been convicted in federal court of heroin and weapons charges and was awaiting sentence. *Id.* at 18-19.

{¶27} At the defense's request, the trial judge referred to the news coverage and asked the jury, en mass, "May I ask you how many of you heard or read anything about it? Ask you further if it had any effect whatsoever on your verdict?" Only a few jurors answered the judge, and no individualized voir dire or further inquiry was made. Immediately after the guilty verdict was returned, defense counsel entered the jury room and found the very newspaper article about which the jurors had been asked. *Id.* at 19-20.

{¶28} The Ohio Supreme Court, citing its prior decision in *State v. Doll*, 24 Ohio St.2d 130, 265 N.E.2d 279 (1970), and the United States Supreme Court's decision in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), held that "the fact that the jurors saw and read newspaper articles, thus becoming aware of other inflammatory evidence in this improper manner together with the combination of prejudicial improprieties, [could] not be cured by judicially

solicited assurances from the jurors to the effect that each was not influenced thereby." As a result, the Supreme Court remanded the case for new trial. *Craven*, 35 Ohio St.2d at 22, 298 N.E.2d 597.

{¶29} In *State v. Dute*, 1st Dist. No. C-020709, 2003-Ohio-2774, ¶ 25, this court held that the trial court had erred in failing to grant a mistrial where seven of 12 jurors had indicated that they had read or heard media stories about the defendant's case, the stories had erroneously reported that Dute and her husband had been previously charged with and or convicted of pandering obscenity, the same crime for which they were standing trial, the information was highly prejudicial, and the trial court had failed to conduct a meaningful voir dire of those jurors who had indicated that they had seen or read the media reports.

{¶30} In our analysis in *Dute*, we acknowledged that *Marshall*, which the Ohio Supreme Court had relied upon in *Craven*, had been limited by the United States Supreme Court in *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See Dute* at ¶ 22. In *Murphy*, the Supreme Court had clarified that *Marshall* was not a constitutional ruling that applied to state courts and that previous cases applying *Marshall* to states' cases "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy* at 799. The *Murphy* court held that courts should employ a "totality of the circumstances test" in determining whether a trial is fundamentally unfair. *Id.* We declined to apply a specific rule in *Dute*, holding instead that under either the *Marshall*, *Doll*, and *Craven* "per se" prejudice test or the *Murphy* totality-of-the-circumstances test, the trial court had erred in refusing to grant Dute's motion for a mistrial. *Dute* at ¶ 25.

{¶31} We find both *Craven* and *Dute* to be distinguishable from the case before us. In *Craven*, the trial court's voir dire was directed at the entire jury at once, and followed numerous attempts by the prosecutor to present the same inadmissible evidence that the jury had read in the article in question. Similarly, in *Dute*, seven of the 12 jurors had indicated that they had heard or read media reports concerning Dute, yet the trial court refused to examine the jurors individually to determine what they had read or heard concerning the case, and whether they could still be fair and impartial. Here, however, the trial court, after learning about the newspaper article, conducted an individualized voir dire of each jury member, thereby preventing the spread of any prejudicial information to the other jury members. To encourage candor during the questioning, the court stated at several points during the voir dire, that there were no right or wrong answers, and both the state and defense counsel were afforded the opportunity to ask follow-up questions of each juror.

{¶32} Similarly, in this case, the newspaper article's mention of possible charges "against the group" and Johnson's "similar charges in Indiana's Ripley and Dearborn counties," while not constituting facts in evidence, was incomparable to the mention of a federal conviction on heroin charges in Craven's trial for carrying concealed weapons and to the mention of a previous charge and conviction for pandering obscenity in Dute's trial for pandering obscenity.

{¶33} Our review of the court's voir dire in Johnson's case, moreover, reveals that most jurors did not read the article and that they had made it clear to others that they did not want to know about the article, despite the lack of an instruction directing them not to do so. The three jurors who had read the article and were retained following voir dire, stated that they had little memory of the article, disregarded what they had read, and, in one instance stated that the article contained

14

"nothing that hadn't already been presented in court, except maybe some money they mentioned." None of the remaining jurors even remembered the statements about possible pending charges. The jurors' responses showed they could be fair and impartial, and that no prejudice occurred due to their limited exposure to the article.

{¶34} Because the trial judge was in the best position to determine the credibility of the jurors and whether the article would affect the fairness of the trial, and because the record supports his determination that the resulting panel could decide Johnson's case impartially, we cannot say that the trial court abused its discretion in denying Johnson's motion for a mistrial. We, therefore, overrule the third assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**HILDEBRANDT, P.J.,** concurs.
**HENDON, J.,** concurs separately.

**HENDON, J.,** concurring separately.

{¶35} I join in the majority opinion, but write separately because I am troubled by the actions of the assistant prosecuting attorney in this case. I recognize that the news media is free to investigate any pending criminal matter, and that neither party can prevent the media from reporting information the media may discover during its own investigation of a case.

{¶36} But an assistant prosecuting attorney, directly or indirectly through a third party, is not free to give the news media information about a pending case that the news media does not already possess which, if printed, could well taint a prosecution already in progress.

**{¶37}** The decision in this case should not be interpreted as an approval of the assistant prosecutor's conduct, nor construed to read that similar actions in the future might be overlooked as harmless error.

**{¶38}** Here, the assistant prosecuting attorney's actions would have resulted in a mistrial in the second week of a four-week jury trial, at a great expense to the county and the defendant, were it not for the exceptional handling of the matter by the trial judge.

Please note:

The court has recorded its own entry this date.